UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| JOHN GORDON WINDLER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> CABOT OIL & GAS CORPORATION, DAN O. DINGES, and SCOTT C. SCHROEDER, <br><br> Defendants. | Case No.: <br><br> CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff John Gordon Windler ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Cabot Oil & Gas Corporation ("Cabot" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Cabot securities between October 23, 2015, and June 12, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Cabot was incorporated in 1989 and is headquartered in Houston, Texas.  Cabot is an independent oil and gas company that explores for, exploits, develops, produces, and markets oil and gas properties in the U.S.

3.      Cabot primarily focuses its oil and gas efforts on the Marcellus Shale located in Susquehanna County, Pennsylvania.  Cabot's gas procuring activities in Pennsylvania have been the subject of controversy for over a decade, with the Company repeatedly denying any responsibility for environmental damage observed in the state.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cabot had inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures; (ii) as a result, Cabot, among other issues, failed to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration; (iii) the foregoing was foreseeably likely to subject Cabot to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm; (iv) Cabot continually downplayed its potential civil and/or criminal liabilities with respect to such environmental

matters; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On July 26, 2019, during intraday trading hours, Cabot filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended June 30, 2019 (the "2Q19 10-Q").  The 2Q19 10-Q disclosed that the Company had received two proposed Consent Order and Agreements ("CO&As") related to two Notices of Violation ("NOVs") it had received from the Pennsylvania Department of Environmental Protection ("PaDEP") back in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding Susquehanna County, Pennsylvania. Specifically, the 2Q19 10-Q stated, in relevant part:

> On June 17, 2019, we received two proposed [CO&As] from the [PaDEP] relating to gas migration allegations in areas surrounding several wells owned and operated by us in Susquehanna County, Pennsylvania. The allegations relating to these wells were initially raised by residents in the area in March and June 2017, respectively, in the form of complaints about their drinking water supply . . . . We received [NOVs] from the PaDEP in June and November, 2017, respectively, for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding these wells . . . . The proposed CO&A [for the June 2017 NOV] . . . if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $215,000 . . . . With regard to the November 2017 NOV, The [*sic*] proposed CO&A, if finalized as drafted, would require Cabot to submit a detailed written remediation plan, continue water sampling and other investigative measures and restore or replace affected water supplies and would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $355,000.

6.      Following the release of the 2Q19 10-Q, Cabot's stock price fell $2.63 per share, or 12.07%, to close at $19.16 per share on July 26, 2019.

7.      Then, on June 15, 2020, during pre-market hours, following a grand jury investigation, the Pennsylvania attorney general's office charged Cabot with fifteen criminal

counts arising from its failure to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration.

8.      On this news, Cabot's stock price fell $0.67 per share, or 3.34%, to close at $19.40 per share on June 15, 2020.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Cabot is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

13.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Cabot securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Cabot is a Delaware corporation with principal executive offices located at Three Memorial City Plaza, 840 Gessner Road, Suite 1400, Houston, Texas 77024.  Cabot's common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "COG."

16.     Defendant Dan O. Dinges ("Dinges") has served as Cabot's Chief Executive Officer at all relevant times.

17.     Defendant Scott C. Schroeder ("Schroeder") has served as Cabot's Chief Financial Officer at all relevant times.

18.     Defendants Dinges and Schroeder are sometimes referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Cabot's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Cabot's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Cabot, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and

misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.    Cabot and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.    Cabot was incorporated in 1989 and is headquartered in Houston, Texas.  Cabot is an independent oil and gas company that explores for, exploits, develops, produces, and markets oil and gas properties in the U.S.

22.    Cabot primarily focuses its oil and gas efforts on the Marcellus Shale located in Susquehanna County, Pennsylvania.  Cabot's gas procuring activities in Pennsylvania have been the subject of controversy for over a decade, with the Company repeatedly denying any responsibility for environmental damage observed in the state.  For example, in 2009, fifteen families in Dimock, Pennsylvania, with contaminated water filed a federal lawsuit against Cabot. Additionally, despite Cabot's receipt of more than 130 drilling violations at its Dimock wells alone, the Company had insisted methane migration in that area's water wells is naturally occurring, pointing to tests taken after drilling had been halted in the area.

### Materially False and Misleading Statements Issued During the Class Period

23.    The Class Period begins on October 23, 2015, when Cabot filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for the quarter ended September 30, 2015 (the "3Q15 10-Q").  The 3Q15 10-Q downplayed Cabot's potential liabilities with respect to environmental matters, advising investors that "[f]rom time to time [Cabot] receive[s] notices of violation from governmental and regulatory authorities in areas

in which [Cabot] operate[s] relating to alleged violations of environmental statutes or the rules and regulations promulgated thereunder," and that, "[w]hile [Defendants] cannot predict with certainty whether these notices of violation will result in fines and/or penalties, if fines and/or penalties are imposed, they may result in monetary sanctions individually or in the aggregate in excess of $100,000."

24.     Appended as an exhibit to the 3Q15 10-Q were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that "the [3Q15 10-Q] fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934," and that "the information contained in the [3Q15 10-Q] fairly presents, in all material respects, the financial condition and results of operations of the Company."

25.     On February 22, 2016, Cabot filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 10-K").  The 2015 10-K touted Cabot's environmental and safety regulation compliance while downplaying the risks associated with such compliance.  For example, the 2015 10-K represented, in relevant part, that Defendants "believe that compliance with environmental regulations will not have a material adverse effect on [Cabot]"; that Defendants "believe that [they] substantially comply with the Clean Water Act and related federal and state regulations"; that, "[a]lthough operating and disposal practices that were standard in the industry at the time may have been utilized, it is possible that hydrocarbons or other wastes may have been disposed of or released on or under the properties currently owned or leased by [Cabot]"; that Cabot "could be required to remove or remediate previously disposed wastes (including wastes disposed or released by prior owners and operators) or clean up property contamination (including groundwater contamination by prior owners or operators) or to perform plugging operations to prevent future

contamination"; and that "[n]o assurance can be given that significant costs and liabilities will not be incurred."

26.     With specific respect to Cabot's response to ongoing environmental matters related to gas migration allegations in Pennsylvania, the 2015 10-K assured investors, in relevant part, that, following receipt of an NOV from the PaDEP in September 2011 for failure to prevent the migration of gas into fresh groundwater sources in the area surrounding several wells owned and operated by Cabot in Susquehanna County, Pennsylvania, Defendants "have been engaged with the PaDEP in investigating the incident and have performed appropriate remediation efforts, including the provision of alternative sources of drinking water to affected residents"; that Defendants "believe the source of methane has been remediated and are working with the PaDEP to reach agreement on the disposition of this matter"; that, on November 12, 2015, Defendants received a "proposed Consent Order and Agreement [that] is the culmination of th[eir] effort[s] and, if finalized, would result in the payment of a civil monetary penalty in an amount likely to exceed $100,000, up to approximately $300,000"; and that Defendants will continue to work with the PaDEP to finalize the Consent Order and Agreement and bring this matter to a close."

27.     The 2015 10-K also contained substantively the same representations as referenced in ¶ 23, *supra*, concerning Cabot's periodic receipt of notices of violation from government and regulatory authorities related to environmental matters, and that Cabot purportedly could not predict the outcome of such notices of violation.

28.     In addition, the 2015 10-K contained generic, boilerplate representations with respect to "environmental and safety regulations, which can adversely affect the cost, manner or feasibility of doing business" for Cabot.  For example, the 2015 10-K represented, in relevant part, that Cabot's "operations are subject to extensive federal, state and local laws and regulations,

including drilling, permitting and safety laws and regulations and those relating to the generation, storage, handling, emission, transportation and discharge of materials into the environment"; that "[t]hese laws and regulations can adversely affect the cost, manner or feasibility of doing business"; that "[g]overnmental authorities have the power to enforce compliance with their regulations, and violations could subject [Cabot] to fines, injunctions or both"; that "[r]isks of substantial costs and liabilities related to environmental compliance issues are inherent in natural gas and oil operations"; that "[f]ailure to comply with these laws also may result in the suspension or termination of [Defendants'] operations and subject [them] to administrative, civil and criminal penalties as well as the imposition of corrective action orders"; and that "[i]t is possible that other developments, such as stricter environmental laws and regulations, and claims for damages to property or persons resulting from natural gas and oil production, would result in substantial costs and liabilities."  Plainly, the foregoing risk warnings were generic "catch-all" provisions that were not tailored to Cabot's actual known risks regarding the Company's inadequate environmental controls and procedures, much less its failure to fix faulty gas wells that were polluting Pennsylvania's water supplies through stray gas migration.

29.    Appended as an exhibit to the 2015 10-K were substantively the same SOX certifications as referenced in ¶ 24, *supra*, which were signed by the Individual Defendants.

30.    On February 27, 2017, Cabot filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K contained substantively the same representations as referenced in ¶¶ 23, 25-26, and 28, *supra*, which discussed Cabot's periodic receipt of notices of violation from government and regulatory authorities related to environmental matters, and that Cabot purportedly could not predict the outcome of such notices of violation; which touted Cabot's

environmental and safety regulation compliance while downplaying the risks associated with such compliance; which reassured investors regarding the Company's response to ongoing environmental matters related to gas migration allegations in Pennsylvania; and which contained generic, boilerplate representations concerning Cabot's risks related to environmental and safety regulations, which were plainly "catch-all" provisions not tailored to Cabot's actual known risks regarding the Company's inadequate environmental controls and procedures, much less its failure to fix faulty gas wells that were polluting Pennsylvania's water supplies through stray gas migration.

31.     In the section of the 2016 10-K discussing Cabot's response to ongoing environmental matters related to gas migration allegations in Pennsylvania, the 2016 10-K additionally assured investors that Cabot "entered into [the previously proposed CO&A] with the PaDEP on December 30, 2016"; that Cabot "agreed to pay a civil monetary penalty in the amount of approximately $0.3 million and to continue to provide alternative sources of drinking water to affected residents until the affected water supplies are permanently restored"; that "the related gas well is being permanently plugged"; and that, "[f]ollowing the plugging of the gas well, additional monitoring will be required to ensure the source of methane has been remediated."

32.     Appended as an exhibit to the 2016 10-K were substantively the same SOX certifications as referenced in ¶ 24, *supra*, which were signed by the Individual Defendants.

33.     On March 1, 2018, Cabot filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 10-K"). The 2017 10-K contained substantively the same representations as referenced in ¶¶ 23, 25, and 28, *supra*, which discussed Cabot's periodic receipt of notices of violation from government and regulatory authorities related to environmental matters, and that

Cabot purportedly could not predict the outcome of such notices of violation; which touted Cabot's environmental and safety regulation compliance while downplaying the risks associated with such compliance; and which contained generic, boilerplate representations concerning Cabot's risks related to environmental and safety regulations, which were plainly "catch-all" provisions not tailored to Cabot's actual known risks regarding the Company's inadequate environmental controls and procedures, much less its failure to fix faulty gas wells that were polluting Pennsylvania's water supplies through stray gas migration.  The 2017 10-K did not contain statements regarding the Company's response to ongoing environmental matters related to gas migration allegations in Pennsylvania, thereby signaling to investors that these matters were no longer an issue, that they had been successively remediated, and that potential liabilities with respect to those matters had been extinguished.

34.     Appended as an exhibit to the 2017 10-K were substantively the same SOX certifications as referenced in ¶ 24, *supra*, which were signed by the Individual Defendants.

35.     On February 26, 2019, Cabot filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 10-K").  The 2018 10-K contained substantively the same representations referenced in ¶¶ 23, 25, and 28, *supra*, which discussed Cabot's periodic receipt of notices of violation from government and regulatory authorities related to environmental matters, and that Cabot purportedly could not predict the outcome of such notices of violation; which touted Cabot's environmental and safety regulation compliance while downplaying the risks associated with such compliance; and which contained generic, boilerplate representations concerning Cabot's risks related to environmental and safety regulations, which were plainly "catch-all" provisions not tailored to Cabot's actual known risks regarding the Company's inadequate environmental controls

and procedures, much less its failure to fix faulty gas wells that were polluting Pennsylvania's water supplies through stray gas migration.  The 2018 10-K did not contain statements regarding the Company's response to ongoing environmental matters related to gas migration allegations in Pennsylvania, thereby continuing to signal to investors that these matters were no longer an issue, that they had been successively remediated, and that potential liabilities with respect to those matters had been extinguished.

36.     Appended as an exhibit to the 2018 10-K were substantively the same SOX certifications as referenced in ¶ 24, *supra*, which were signed by the Individual Defendants.

37.     The statements referenced in ¶¶ 23-36 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cabot had inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures; (ii) as a result, Cabot, among other issues, failed to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration; (iii) the foregoing was foreseeably likely to subject Cabot to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm; (iv) Cabot continually downplayed its potential civil and/or criminal liabilities with respect to such environmental matters; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

38.     On July 26, 2019, during intraday trading hours, Cabot filed the 2Q19 10-Q, which disclosed that the Company had received two proposed CO&As related to two NOVs it had

received from the PaDEP *back in June and November, 2017*, respectively, for failure to prevent

the migration of gas into fresh groundwater sources in the area surrounding Susquehanna County,

Pennsylvania.  Specifically, the 2Q19 10-Q stated, in relevant part:

> On June 17, 2019, we received two proposed [CO&As] from the [PaDEP] relating
> to gas migration allegations in areas surrounding several wells owned and operated
> by us in Susquehanna County, Pennsylvania. The allegations relating to these wells
> were initially raised by residents in the area in March and June 2017, respectively,
> in the form of complaints about their drinking water supply . . . . We received
> [NOVs] from the PaDEP in June and November, 2017, respectively, for failure to
> prevent the migration of gas into fresh groundwater sources in the area surrounding
> these wells . . . . The proposed CO&A [for the June 2017 NOV] . . . if finalized,
> would result in the payment of a civil monetary penalty in an amount likely to
> exceed $100,000, up to approximately $215,000 . . . . With regard to the November
> 2017 NOV, The [*sic*] proposed CO&A, if finalized as drafted, would require Cabot
> to submit a detailed written remediation plan, continue water sampling and other
> investigative measures and restore or replace affected water supplies and would
> result in the payment of a civil monetary penalty in an amount likely to exceed
> $100,000, up to approximately $355,000.

39.     Following the release of the 2Q19 10-Q, Cabot's stock price fell $2.63 per share,

or 12.07%, to close at $19.16 per share on July 26, 2019.  Despite this decline in Cabot's stock

price, the Company's securities continued to trade at artificially inflated prices throughout the

remainder of the Class Period as a result of Defendants' continued misstatements and omissions

related to its environmental controls and procedures and potential liability with respect to

deficiencies in those controls and procedures.

40.     For example, in the same section of the 2Q19 10-Q that revealed Cabot's additional

failures to prevent the migration of gas into fresh groundwater sources in Pennsylvania, the 2Q19

10-Q assured investors that, following the receipt of the NOVs from the PaDEP, Defendants "have

been engaged with the PaDEP in investigating the incidents and have performed appropriate

remediation efforts, including the provision of alternative sources of drinking water to the affected

residents"; that, "[w]ith regard to the June 2017 NOV, [Defendants] believe these water quality

13

complaints have been resolved, and [they] are working with the PaDEP to reach agreement on the disposition of this matter"; that "[t]he proposed CO&A [for the June 2017 NOV] is the culmination of [Defendants'] effort[s]"; that Defendants "will continue to work with the PaDEP to finalize the CO&A [related to the June 2017 NOV], and to bring this matter to a close"; and that, with respect to the November 2017 NOV, Defendants "will continue to work with the PaDEP to finalize the CO&A, and to complete the ongoing investigation and remediation."

41.     Additionally, on February 25, 2020, Cabot filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 10-K").  The 2019 10-K contained substantively the same representations referenced in ¶¶ 23, 25, 28, and 40, *supra*, which discussed Cabot's periodic receipt of notices of violation from government and regulatory authorities related to environmental matters, and that Cabot purportedly could not predict the outcome of such notices of violation; which touted Cabot's environmental and safety regulation compliance while downplaying the risks associated with such compliance; which contained generic, boilerplate representations concerning Cabot's risks related to environmental and safety regulations, which were plainly "catch-all" provisions that were not tailored to Cabot's actual known risks regarding the Company's inadequate environmental controls and procedures, much less its failure to fix faulty gas wells that were polluting Pennsylvania's water supplies through stray gas migration; and which reassured investors regarding the Company's response to ongoing environmental matters related to gas migration allegations in Pennsylvania.

42.     Appended as an exhibit to the 2019 10-K were substantively the same SOX certifications as referenced in ¶ 24, *supra*, which were signed by the Individual Defendants.

43.     The statements referenced in ¶¶ 40-42 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Cabot had inadequate environmental controls and procedures and/or failed to properly mitigate known issues related to those controls and procedures; (ii) as a result, Cabot, among other issues, failed to fix faulty gas wells, thereby polluting Pennsylvania's water supplies through stray gas migration; (iii) the foregoing was foreseeably likely to subject Cabot to increased governmental scrutiny and enforcement, as well as increased reputational and financial harm; (iv) Cabot continually downplayed its potential civil and/or criminal liabilities with respect to such environmental matters; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Fully Emerges**

44.     On March 3, 2020, Pennsylvania Attorney General Josh Shapiro ("Shapiro") revealed that he was conducting investigations into companies involved in the oil and gas industry in the state, which was the first acknowledgment by Shapiro of the investigations, and which involved an investigative grand jury in Pittsburgh for more than a year.   It was also the latest revelation into criminal investigations of the oil and gas industry in Pennsylvania.   In Shapiro's comments to the *Pittsburgh Post-Gazette*, Shapiro stated that criminal charges were expected "in the near future" and that his office was putting "enormous resources" into the investigation.

45.     Finally, on June 15, 2020, during pre-market hours, following a grand jury investigation, the Pennsylvania attorney general's office charged Cabot with fifteen criminal

counts arising from its failure to fix faulty gas wells, thereby polluting Pennsylvania's water

supplies through stray gas migration.  For example, *The Seattle Times* reported, in relevant part:

> Houston-based Cabot Oil & Gas Corp. was charged Monday following a grand jury investigation that found the company has failed to fix faulty gas wells that are leaking methane into residential water supplies in Dimock and surrounding communities.

> \* \* \*

> "We find that, over a period of many years, and despite mounting evidence, Cabot . . . failed to acknowledge and correct conduct that polluted Pennsylvania water through stray gas migration," the grand jury wrote, criticizing Cabot's "long-term indifference to the damage it caused to the environment and citizens of Susquehanna County."

> The Pennsylvania attorney general's office charged Cabot with a total of 15 criminal counts, including illegal discharge of industrial wastes and unlawful conduct under the state's Clean Streams Law. Maximum fines are $50,000 or $25,000, depending on the count.

> \* \* \*

> The company has long insisted the gas in Dimock's aquifer is naturally occurring, saying its pre-drill testing of thousands of private water wells in the area show a high percentage with methane. The grand jury asserted that Cabot's initial sampling of wells and groundwater did not include tests for methane. State environmental regulators eventually determined that Cabot's drilling and fracking operations leaked explosive levels of methane into private water supplies.

> \* \* \*

> Residents said they suffered ill health effects from the contamination of their water with methane and drilling chemicals, including nausea, dizziness, skin rashes, impaired vision and breathing difficulties. Property values plummeted, too, they said.

46.    *The Seattle Times* also quoted Shapiro, who stated, in relevant part, that "Cabot

took shortcuts that broke the law, damaged our environment, harming our water supplies and

endangering Pennsylvanians"; that Defendants "put their bottom line ahead of the health and safety

of our neighbors"; that the grand jury's ongoing probe "will result in more criminal charges"; that

Cabot "continues to abdicate their responsibility"; and that "Cabot knows what they've done," that "[t]he residents of the commonwealth whose lives have been impacted know what Cabot has done," and that "[t]he game that Cabot continues to play, risking the lives of people across the commonwealth for a profit, well, that cannot go on any longer."

47.     On this news, Cabot's stock price fell $0.67 per share, or 3.34%, to close at $19.40 per share on June 15, 2020.

48.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

49.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Cabot securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

50.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Cabot securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Cabot or its transfer agent and may be notified of the

pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

51.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

52.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

53.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Cabot;

- whether the Individual Defendants caused Cabot to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Cabot securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

55.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Cabot securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Cabot securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

56.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

57.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

58.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

59.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

60.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Cabot securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Cabot securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

61.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Cabot securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Cabot's finances and business prospects.

62.     By virtue of their positions at Cabot, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

63.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Cabot, the Individual Defendants had knowledge of the details of Cabot's internal affairs.

64.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Cabot.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Cabot's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Cabot securities was artificially inflated throughout the Class Period.  In ignorance of the adverse

facts concerning Cabot's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Cabot securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

65.     During the Class Period, Cabot securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Cabot securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Cabot securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Cabot securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

66.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)**

68.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.     During the Class Period, the Individual Defendants participated in the operation and management of Cabot, and conducted and participated, directly and indirectly, in the conduct of Cabot's business affairs.  Because of their senior positions, they knew the adverse non-public information about Cabot's misstatement of income and expenses and false financial statements.

70.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Cabot's financial condition and results of operations, and to correct promptly any public statements issued by Cabot which had become materially false or misleading.

71.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Cabot disseminated in the marketplace during the Class Period concerning Cabot's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Cabot to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Cabot within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Cabot securities.

72.     Each of the Individual Defendants, therefore, acted as a controlling person of Cabot. By reason of their senior management positions and/or being directors of Cabot, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

Cabot to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Cabot and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

73.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Cabot.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 13, 2020

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
(S.D. Tex. Federal Bar Number 1466757)
J. Alexander Hood II
(S.D. Tex. Federal Bar Number 3086579)
600 Third Avenue, 20th Floor

New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, _JOHN GORDON WINDLER_____, make this declaration pursuant to

Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities

Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of

1995.

2.      I have reviewed a Complaint against Cabot Oil & Gas Corporation ("Cabot" or the

"Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Cabot securities at the direction of plaintiffs' counsel or in

order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who

purchased or otherwise acquired Cabot securities during the class period, including providing testimony at

deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate

lead plaintiff in this action.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Cabot

securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have

not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the

class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs

and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.


**Executed** 08/10/2020
                    **(Date)**



_____
                    **(Signature)**

JOHN GORDON WINDLER
                    **(Type or Print Name)**

**Cabot Oil & Gas Corporation (COG)**                                      **Windler, John Gordon**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 6/15/2018 | 50 | $23.6400 |